No. 87-157

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

_____

KENNETH REIL,

        Claimant and Respondent,

  -vs-

BILLINGS PROCESSORS, INC.,
        Employer,
    and
STATE COMPENSATION INSURANCE FUND,

        Defendant and Appellant.

_____

APPEAL FROM:  The Workers' Compensation Court, The Honorable
               Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James M. Scheier, Agency Legal Services, Helena,
        Montana
        Nancy Butler, State Comp. Insurance, Helena, Montana

    For Respondent:

        Lloyd Hartford, Billings, Montana

_____

Submitted on Briefs:  Aug. 6, 1987

Decided:  December 3, 1987

Filed:  DEC 3 - 1987

*Ethel M. Harrison*

_____
                 Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

The State Compensation Insurance Fund appeals a Workers' Compensation Court judgment finding Kenneth Reil to be entitled to temporary total disability benefits and medical benefits. The Workers' Compensation Court found that Mr. Reil had suffered a compensable injury arising out of and in the scope of his employment and that he had given his employer sufficient notice of the injury pursuant to § 39-71-603, MCA. We reverse the decision of the Workers' Compensation Court on the notice issue and remand with directions to dismiss the case.

Ken Reil suffers a congenital deformity in the radioulnar joints of his arms. At age fourteen, Reil underwent four surgeries in an attempt to correct these deformities. The deformities cause Reil a considerable amount of pain in his hands, wrists and elbows. The pain has bothered Reil for years and his condition continues to worsen over time.

Reil underwent two later surgeries in 1980 and 1981 for an injury to his left wrist suffered in an industrial accident while employed with a Billings meat packing plant. Reil received a $25,000 settlement of his workers' compensation benefits for the February 1980 injury. Thereafter, Reil continued to experience pain both as a result of the 1980 accident and his congenital deformities.

After the 1980 accident, Reil's doctor advised him to avoid heavy work. Pursuant to the doctor's suggestions, Reil enrolled in a computer program training course of instruction at Eastern Montana College. Reil quit school after one academic quarter to take a job as a computer operator with Yellowstone Processors of Billings. At his initial job

2

interview, Reil informed Yellowstone Processors of his congenital deformities and progressive pain. Yellowstone Processors was the predecessor company of Billings Processors.

Reil's initial position with Yellowstone Processors, and later with Billings Processors, required that he load and unload computer tape reels from a computer. Sometime in 1982, Yellowstone Processors transferred Reil to a data storage position. Reil's responsibilities in data storage were to pick-up and deliver client computer tapes, stack boxes of computer tapes, catalogue tapes, and file tapes. Reil worked with Yellowstone in data storage until the spring of 1984 when he was laid-off. Reil experienced pain in his arms throughout his tenure with Yellowstone Processors.

Reil next ran a high pressure power spray washer for a company called High Plains Power Wash. Operating the high pressure washer caused Reil pain in his elbows and wrists. Reil returned to Billings to work for Carey Data as a computer tape cataloger after one month with High Plains Power Wash. Reil experienced pain in his elbows and wrists while lifting twenty to thirty pound boxes of computer tapes for Carey Data. In August of 1984, while with Carey Data, Reil began a second job as a computer operator with Billings Processors. With the exception of one person, the personnel and management at Billings Processors were the same people Reil had worked with at Yellowstone Processors. After a month of holding down two jobs, Reil's position with Carey Data was discontinued.

Reil loaded and unloaded one-pound computer tape reels, lifted twenty to thirty pound boxes to waist level, and typed for Billings Processors. Reil also performed light janitorial work on his own initiative. All of these activities caused Reil varying degrees of pain and

discomfort. During slower work periods, Reil was allowed to watch a television he stored in a false ceiling above his desk. In addition, Reil played basketball with his supervisors and fellow employees on a weekly basis and went hunting in the fall. Lifting the television, playing basketball, and hunting also caused Reil pain in his arms as did most activities utilizing his arms or hands.

Reil occasionally complained to his employers that his arms and wrists hurt. However, Reil did not relate to his employers that this pain was as a result of his work related duties. Reil's employers assumed that his problems were merely the consequences of the congenital deformities. Reil did not ask to be reassigned to another position nor did he request that his employers modify his duties to reduce the necessity for use of his arms and hands.

Reil's congenital arm problems progressively worsened from August to December of 1985. On January 7, 1986, Reil's doctor advised him that he would have to undergo more surgeries to his left and right wrists on January 20, and March 24, 1986, respectively. These surgeries were to remove prosthetic devices that had been previously implanted into Reil's arms. At Reil's request, Billings Processors laid him off the job so that he could undergo surgery and collect unemployment compensation during convalescence. Reil's last day on the job with Billings Processors was January 16, 1986. Thereafter, Reil received six months of unemployment benefits and did not return to work for Billings Processors.

On July 11, 1986, more than five months after leaving Billings Processors, Reil filed a claim for compensation with the Division of Workers' Compensation. The State Insurance Fund denied compensation on the grounds that Reil failed to give his employer sufficient notice pursuant to § 39-71-603, MCA, and he had not suffered a compensable injury as defined

4

by § 39-71-119(1), MCA. The Workers' Compensation Court heard the matter and found that Reil suffered a compensable injury for which Billings Processors had sufficient actual knowledge. The State Compensation Insurance Fund appeals and raises the following issues:

(1) Did the claimant fail to comply with the notice requirement of § 39-71-603, MCA?

(2) Is there insufficient evidence to establish that the claimant suffered a compensable injury under the Workers' Compensation Act?

On cross-appeal, Reil asserts the following issues:

(1) Whether the Workers' Compensation Court's failure to impose the 20% penalty against the insurer for its refusal to pay compensation and medical benefits is justified where substantial evidence of record fails to demonstrate the existence of a bona fide controversy?

(2) Whether the Workers' Compensation Court erred when it ordered the insurer and claimant to apply accrued compensation benefits to repay the Unemployment Insurance Division the unemployment benefits claimant received during the period in question where § 39-71-743, MCA, prohibits said funds being used to reduce such debts?

(3) Whether the appellant's appeal is frivolous and therefore subject to the penalties set forth in Rule 32, M.R.App.P.?

We find the State Insurance Fund's first issue to be dispositive of this appeal. The Workers' Compensation Court considered certain facts cumulatively and interpreted § 39-71-603, MCA, to impute constructive knowledge of an injury to the employer, Billings Processors. The appropriate standard of review in this matter, therefore, is to determine whether the lower court's interpretation of the law, as applied to the particular facts of this case, is correct.

5

Wassberg v. Anaconda Copper Co. (Mont. 1985), 697 P.2d 909, 912, 42 St.Rep. 388, 391. Accordingly, we are free to examine the lower court's legal analysis and draw our own conclusions. Wassberg, supra.

This Court consistently stresses the importance of employee compliance with the sixty day notice provision of Montana's workers' compensation laws. Masters v. Davis Logging (Mont. 1987), ____ P.2d ____, 44 St.Rep. 1664; Hunt v. Sherwin Williams Co. (Mont. 1981), 624 P.2d 489, 38 St.Rep. 358. Under § 39-71-603, MCA, notice of an industrial accident is "mandatory and compliance with [the requirements of the statute] are indispensable to [maintaining] a claim for compensation . . . " Dean v. Anaconda Co. (1959), 135 Mont. 13, 16, 335 P.2d 854, 856. Section 39-71-603, MCA, provides the following:

> No claim to recover benefits under the Workers' Compensation Act, for injuries not resulting in death, may be considered compensable unless, within 60 days after the occurrence of the accident which is claimed to have caused the injury, notice of time and place where the accident occurred and the nature of the injury is given to the employer or the employer's insurer by the injured employee or someone on the employee's behalf. Actual knowledge of the accident and injury on the part of the employer or the employer's managing agent or superintendent in charge of the work upon which the injured employee was engaged at the time of the injury is equivalent to notice.

It is undisputed that Reil did not give his employer written notice of a work related injury. The Workers' Compensation Court found, however, that Billings Processors had sufficient actual knowledge to satisfy the statute. We disagree with

6

the lower court's application of the facts to the law of this case.

The Workers' Compensation Court made the following findings of fact relevant to the issue of notice:

28. Claimant states that he notified his employers that he was having pain in his arms and he was going to see his doctor on January 7, 1986.

29. After finding out he needed surgery, claimant asked his employers if he could be laid off so that he could draw unemployment while he had his surgery.

30. Claimant's initial request to be laid off was refused, but within a matter of a few days (possibly the next day) the decision was made to grant claimant his request and he was laid off.

31. Claimant states that he asked his employer if he would be able to return to work after his surgery and that he was told he could not come back until he was able to handle all of the duties of his job.

32. John Smatla, who was Vice-President of Billings Processors at the time of claimant's employment, testified that he knew of claimant's congenital problems, prior to claimant coming to work for Billings Processors, but that claimant never told him that the difficulties he was having with his arms were a result of his job duties. Mr. Smatla also testified that claimant's termination was voluntary, and that claimant wanted to leave because he wasn't getting enough hours, that he wanted to go to school and that he wanted to look for a better job.

33. Richard DeLanty, who was Vice-President of Operations at Billings Processors during claimant's employment, testified that he knew of claimant's congenital difficulties prior to

claimant's employment with Billings Processors. In January of 1986, claimant told Mr. DeLanty that he was having problems with his arms and constant pain in one arm and that he needed to have surgery done. Mr. DeLanty stated that claimant never told him that claimant's arm problems were related to his work, but he did know claimant had problems.

34. Gale Behm was claimant's supervisor during claimant's employment with Billings Processors. Mr. Behm and claimant are cousins and have known each other since childhood. Mr. Behm stated that the "sole reason" claimant wanted to be laid off was to have surgery on his arms. Mr. Behm knew of claimant's congenital problem, knew claimant was having constant pain and wanted to have surgery, but denied any knowledge that claimant's problems might be connected with work.

35. Claimant's last day of work for Billings Processors was January 16, 1986, a Thursday. Claimant filed for unemployment the next day and had surgery performed on Monday, January 20, 1986. Claimant received his full six months of unemployment, the State finding that his post-operative disability occurred after his layoff. Claimant has not worked since January 16, 1986. Claimant filed a claim for compensation on July 11, 1986.

36. Claimant testified that he never told his employers at Billings Processors that he had suffered an on-the-job injury, but that he did tell them that he suffered pain from some of his duties.

The Workers' Compensation Court found that "[t]he employer knew of the preexisting condition, knew claimant was having problems, knew claimant had to stop work to have surgery for his problem, and knew claimant's work was aggravating claimant's symptoms" and concluded that this was sufficient

8

actual knowledge of an injury under § 39-71-603, MCA. All but the last finding are supported by the record of this case.

When deposed and questioned by counsel for the State Insurance Fund, Reil testified as follows regarding the issue of notice:

> Q: Now, did you ever tell either Dick Delanty or John Smatla or Gale Behm that you had a work related injury or series of injuries?
>
> A: No, I didn't.

When questioned about the information he provided on his initial compensation claim form, Reil went on to testify as follows:

> Q: The second line up from the bottom [in the block entitled Accident Information] is: "Did you notify your employer of the accident?" It says, "Yes." "Who did you notify?" It says, "Dick Delanty." "How?" "Told him of problems caused by work." Now is that true?
>
> A: Well, really just kind of in a sense. I really never came right out and told Dick that I was having problems due to the job. I said, "But I'm having a lot of problems with my arms lifting and carrying things, and I don't know what's causing it so that's why I went and saw the doctor." As far as being specific and notifying him of an accident, no, I didn't.
>
> Q: So correct me if I'm wrong, but Dick knew that you had -- were suffering pain and had some problems, but what you are saying is he didn't have any way of knowing if that was work related or you didn't tell him if that was work related.

9

A: I didn't tell him it was work related, no.

In addition, the transcript of the Workers' Compensation hearing reveals the following exchange between Reil and his attorney:

Q: Did you tell [your employer] that it was the functions of your job, the physical requirements of your job, that caused this pan?

A: No, I didn't. I told them that I was having a lot of problems with my arms and that when I lifted or carried something that they would bother me quite a bit and I wanted to go to the doctor.

After a short recess, and when questioned by the State Insurance Fund's attorney, Reil changed his testimony as reflected by the following:

Q: Okay. Now you didn't ever tell any of your supervisors at Billings Processors that you had suffered an on-the-job injury, did you?

A: No.

Q: Did you ever tell your supervisors at Billings Processors that your job duties were causing pain or discomfort in your arms?

A: Yes, I did. I mentioned to them a few times that when I lifted or carried things that it would cause pain. It was just kind of a -- it wasn't the topic of conversation but I had mentioned it to them quite a few times.

When confronted with his prior inconsistent statements, Reil was asked whether he was now telling the court something different, to which he answered:

A: No, it is not anything different. I told Dick Delanty that I was having pain

10

because I was lifting and carrying things and that's all I told him. I mean I didn't come right out and say that my job is causing these pains, or causing my problems, but I am having a lot of pain lifting and carrying things and I left it at that.

Q: So you told him you were having a lot of pain because of lifting and carrying things. If you didn't specify that it was because of the job duties, for all he knew it could have been because of something you were doing at home, is that right?

A: Well, yes, but my job entailed lifting and carrying things, so I guess I more or less assumed that he knew that.

Q: But you never told him that the pain was being caused by lifting and carrying things at the job, is that what you are saying now?

A: Yes, I guess in a sense. I told him I was having pain due to lifting and carrying things and I pretty much just left it at that.

Reil's supervisors and fellow employees consistently told the same story: Reil did not mention that his job duties caused him pain. Reil's testimony on the subject is, at best, inconsistent. The lower court recognized and resolved these inconsistencies in Reil's favor by concluding that they "were caused . . . by the artful phrasing of questions . . . " Regardless of how the witnesses' answers were solicited, the facts of this case do not support a finding that Billings Processors had sufficient actual knowledge of an injury pursuant to § 39-71-603, MCA.

The lower court correctly recognized that "[a]ctual knowledge of the accident or injury, while equivalent of notice, must be more than simple knowledge that the claimant

11

is ill, or that claimant is injured." See Dean v. Anaconda Co. (1959), 135 Mont. 13, 16, 335 P.2d 854, 856; State ex rel. Magelo v. Industrial Accident Board (1936), 102 Mont. 455, 464, 59 P.2d 785, 789. The most that Billings Processors can be said to have known in this case is that Kenneth Reil had congenital problems and these problems often caused him pain. Simple knowledge on the part of Billings Processors that Reil was experiencing pain does not satisfy the actual knowledge requirement of § 39-71-603, MCA.

"The purpose of the notice requirement or actual knowledge in lieu thereof is to enable the employer to protect himself by prompt investigation of the claimed accident . . . " Bender v. Roundup Mining Co. (1960), 138 Mont. 306, 313, 356 P.2d 469, 473. In the instant case, the notice or actual knowledge requirement serves the additional purpose of enabling the employer to reassign an employee with a congenital defect to another position or modify his duties to reduce the necessity for use of his arms and hands.

Reil's employers were aware that he suffered a congenital defect. They were also aware that Reil lifted a heavy television for his own entertainment while at work, played basketball, and hunted. It was incumbent upon Reil, therefore, to specifically advise Billings Processors that it was his job-related duties that exacerbated these congenital problems. As stated by Larson in his treatise on workers' compensation law:

> As a matter of common sense, the fact that claimant is known to have a preexisting occupational weakness increases the burden on the claimant to show that the employer's knowledge of the particular manifestation of injury should be taken as knowledge that it was work-connected . . . [I]t is not reasonable to expect an employer to launch an investigation every time a

12

> foreman hears someone complain of pain or
> sees someone get a bump, and such
> knowledge does not therefore satisfy the
> objectives of the notice statute.
> (Emphasis added.)

3 Larson, Workmans' Compensation Law, § 78.31(a), p. 15-113 (1983). Reil off-handedly related to his employers that he was experiencing problems. To hold that this is sufficient actual knowledge of an injury would thwart the purposes of the statute. There is no substantial evidence to support the lower court's decision on the notice issue.

The Workers' Compensation Court also erred in considering the cumulative effect of the facts in this particular case. "Actual knowledge of an accident and injury . . . " or, as alleged in this case, actual knowledge of a job-induced aggravation of a preexisting condition, "on the part of . . . the employer's managing agent or superintendent . . . " can be imputed as notice to the employer. Section 39-71-603, MCA; Maki v. Anaconda Copper Co. (1930) 87 Mont. 314, 322, 287 P. 170, 173. The Workers' Compensation Court imputed constructive knowledge of an injury to the employer, Billings Processors, on the basis of facts "considered cumulatively." However, in construing § 2933, R.C.M. (1947), the predecessor statute to § 39-71-603, MCA, we recognized that "[i]t is clear from these provisions that any kind of knowledge, other than actual, or first-hand knowledge, would be insufficient, for the statutory equivalent of information required to be given in the notice is actual knowledge." Maki, 87 Mont. at 323, 287 P. at 173 (citing Smith v. Industrial Acc. Com. (Cal. 1917), 162 P. 636, 637). Accordingly, constructive knowledge imputed to the employer on the basis of facts taken cumulatively is insufficient to meet the requirements of § 39-71-603, MCA, under the particular circumstances of this case.

Reil also argues that his injury is "latent" and the sixty-day notice requirement should be tolled until such time as he realized the alleged compensable nature of his pain. To support this argument, Reil relies on our decision in Bowerman v. Employment Security Commission (Mont. 1983), 673 P.2d 476, 40 St.Rep. 2062. In Bowerman we held that the one-year notice of claim limitation of § 39-71-601, MCA, "does not begin to run until the claimant, as a reasonable man, should recognize the nature, seriousness and probable compensable nature of his latent injury." Bowerman, 673 P.2d at 479, 40 St.Rep. at 2065. The basis of our holding in Bowerman was a 1973 legislative addition to § 39-71-601, MCA, whereby "[t]he division may, upon reasonable showing by the claimant of lack of knowledge of disability, waive the time requirement up to an additional 24 months." Section 39-71-601(2), MCA. Bowerman, however, does not apply to § 39-71-603, MCA, for the simple reason that the legislature did not amend this statute to allow for waiver of the sixty-day notice of injury requirement. Compare §§ 39-71-601 and -603, MCA. We also note with approval that the lower court found with regard to Reil's latent injury argument that "simple ignorance of compensability, absent any evidence of estoppel by the employer or medical disinformation [is insufficient] to toll the notice requirement."

Constructive knowledge is not enough to satisfy the requirements of § 39-71-603, MCA. An employer, or its managing agent or supervisor, must have actual knowledge of the accident and injury. The fact that Billings Processors knew Reil was experiencing pain, either taken alone or cumulatively with the other facts of this case, does not constitute actual knowledge. Accordingly, the lower court erred in finding that Billings Processors had actual knowledge of Reil's alleged injury. We find that Billings

14

Processors had no actual knowledge of either an injury or a job-induced aggravation of a preexisting condition in this case. Because of this finding we do not address the other issues presented on this appeal. The decision of the Workers' Compensation Court is reversed with directions to dismiss the case.

Reversed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

15

Mr. Justice John C. Sheehy, dissenting:


The statement of the majority that "Billing Processors had no actual knowledge of either an injury or a job-induced aggravation of a preexisting condition in this case," is not founded on fact in the record, and is expressly adverse to the findings of the Workers' Compensation Court.

The findings of the Workers' Compensation judge include the following:

> Fourth, claimant testified that he told his supervisors that his work was causing him problems. Admittedly, there are some inconsistencies in claimant's testimony. There are conflicts between claimant's testimony and the testimony of the employers' representatives. However, the inconsistencies and conflicts are caused more by the artful phrasing of questions rather than by claimant's or his supervisors response. Claimant, may, indeed, have never been so specific as to say--"I have suffered an on-the-job industrial injury--to this part of my right arm--on this date--resulting in this condition."--but; claimant did impart sufficient information to his employers for them to have actual knowledge of injury . . ."

Based on conflicting evidence of the record, the court resolved the matter of credibility and determined:

> The employer knew of the preexisting condition, knew claimant was having problems, knew claimant had to stop work to have surgery for his problem, and knew claimant's work was aggravating claimant's symptoms. This actual knowledge is sufficient to satisfy both the letter and the purpose of the notice requirements of § 39-71-603, MCA.

For more than 50 years, this Court has been saying that the first duty of those who administer the Workers' Compensation Act is to give the employee the greatest possible protection consistent with its purposes. Miller v. Aetna Life Insurance Company (1936), 101 Montana 212, 53 P.2d 704; in considering the Workers' Compensation Act, all of the

- 16 -

sections as originally enacted or amended, must be considered together in such manner as to give effect to the Act as a whole. State ex rel. Roundup Coal Mining Company v. Industrial Accident Board (1933), 94 Mont. 386, 23 P.2d 253.

The majority have not followed the standard of review applicable to workers' compensation cases. We have said that the decisions of the Workers' Court will not be disturbed if supported by substantial evidence. Skukrud v. Gallatin Laundry Company, Inc. and Employees Commercial Union Insurance Company (1976), 171 Mont. 217, 557 P.2d 278. Where findings are based on conflicting evidence, the reviewing court's function is confined to determining whether there is substantial evidence supporting such findings. It is not the court's function to determine whether there is sufficient evidence to support contrary findings. Wilson v. Glacier General Assurance Company (Mont. 1983), 670 P. 931, 40 St.Rep. 1509; Stamatis v. Bechtel Power Corporation (1979), 184 Mont. 64, 601 P.2d 403. We have always stated that we will not substitute our judgment for that of the Workers' Compensation Court as to the weight of evidence on questions of fact. Robbins v. Anaconda Aluminum Company (1978), 175 Mont. 514, 575 P.2d 67; Brurud v. Judge Moving and Storage Company (1977), 172 Mont. 249, 516 P.2d 558.

In the light of the findings made by the Workers' Compensation Court on disputed evidence, and the usual standards of review applied to such findings, the duty of this Court is to sustain the decision of the Workers' Compensation Court, and not set it aside on the dubious authority of a 1917 California case.

This Court has become the trier of both fact and law.

John C. Sheehy
—————————————
Justice

- 17 -

Mr. Justice William E. Hunt, Sr., concurring:

I concur with the foregoing dissent.

_____
Justice