No. 02-298

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 334

EDNA HANKS,

       Petitioner and Appellant,

  v.

LIBERTY NORTHWEST INSURANCE CORP.,

       Respondent and Insurer for

PARTNERS IN HOME CARE, INC.,

       Employer.

APPEAL FROM:    Workers' Compensation Court of the State of Montana,
                  Honorable Mike McCarter, Judge Presiding

COUNSEL OF RECORD:

       For Appellant:

           Eric Rasmusson, Bulman Law Associates, PLLC, Missoula, Montana

       For Respondent:

           Larry W. Jones and Carrie L. Garber, Liberty Northwest Insurance Corp.,
           Missoula, Montana

Submitted on Briefs:  August 8, 2002

Decided:   December 20, 2002

Filed:

_____
                     Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Appellant Edna Hanks (Hanks), appeals the Workers' Compensation Court's dismissal of her workers' compensation claim with prejudice. We affirm.

¶2 The sole issue on appeal is whether the Workers' Compensation Court erred in concluding that Hanks had suffered an injury under the Workers' Compensation Act and in turn dismissing her occupational disease claim?

Background

¶3 On July 31, 1995, Hanks went to work for Partners in Home Care, Incorporated (Partners), as a home-care aide. Her job entailed helping patients with baths and their basic personal care, including helping wheelchair bound patients into and out of their wheelchairs. In January 2001, Hanks, then 65 years old, felt a "krik" or "twinge" in her back while helping an Alzheimer's patient dress. Hanks described the event as causing a "pop-type sound" and "a little pain." She did not report the incident to her supervisor at the time.

¶ 4 Prior to the "krik" incident, Hanks had never experienced back problems. Following the "krik" incident, Hanks continued to experience pain. Two or three days after the incident, Hanks began having difficulty getting into and out of her car due to pain radiating into her right leg. On February 8, 2001, Hanks visited Dr. Susan Selbach, her family physician. Dr. Selbach's office notes for that visit state that Hanks "complains that she has been having some right-sided lower back pain that goes down into her buttocks, has doubled her over on occasion." When considering possible etiologies of the pain, Dr. Selbach noted only, "She does not remember any recent falls."

2

¶ 5 Despite a trial of physical therapy, Hanks continued to experience low-back pain radiating into her buttocks and leg. On March 13, 2001, Hanks underwent an MRI which revealed a left-sided protruding disc at the L4-5 level, as well as significant degenerative changes at that level. Dr. Selbach restricted Hanks to light duty on March 27, 2001, and referred her to Dr. Carter Beck, a neurosurgeon. The next day Hanks told her supervisor about her back pain and the "krik" incident. Hanks' supervisor filled out a first report that day which indicated that Hanks' pain was "chronic" and that Hanks was "not sure" of the cause of her pain. Hanks could not recall the date of the "krik" incident, only that it had occurred a couple of months previous, probably sometime in mid-January.

¶ 6 Hanks was seen by Dr. Beck on April 3, 2001. He reviewed her MRI, which he read as showing "lumbar stenosis at L4-5 where there is bilateral neural foraminal stenosis and subarticular recess stenosis." On May 9, 2001, he performed a bilateral L4-5 laminotomy and foraminotomy with partial mesial facetectomy.

¶ 7 Liberty, the insurance provider for Partners, denied Hanks benefits on account of her failure to report the "krik" incident to her employer within 30 days of its occurrence as required by the Workers' Compensation Act.

¶ 8 On August 27, 2001, at the request of the Department of Labor and Industry, Dr. Randale C. Sechrest, an orthopedic surgeon, examined Hanks. Dr. Sechrest reported that Hanks suffered from "long-standing degenerative changes in the lumbar spine" which were rendered symptomatic in January or February of 2001, and most likely were aggravated by her activity at work. In his report, Dr. Sechrest stated that Hanks' need for surgery "arose

3

from her underlying degenerative disease" and "spinal stenosis secondary to [her] long-standing degenerative" disease. In his deposition, he reiterated that Hanks had long-standing and extensive degenerative back disease, but also added that her condition was aggravated and made symptomatic by the "krik" incident.

¶ 9 The Workers' Compensation Court granted Hanks' petition for an emergency trial, which was conducted on December 10, 2001. On March 22, 2002, it issued a judgment dismissing Hanks' claim with prejudice based on its findings that although Hanks had suffered an injury under the Workers' Compensation Act, she had failed to comply with the Act's 30-day notice requirement. Hanks appeals from this judgment. We affirm.

Discussion

¶ 10 Did the Workers' Compensation Court err in concluding that Hanks had suffered an injury under the Workers' Compensation Act and in turn denying her occupational disease claim?

¶ 11 A claimant has the burden of proof that he or she is entitled to benefits under the Workers' Compensation Act. *King v. TTC Illinois, Inc.*, 2000 MT 260, ¶ 11, 301 Mont. 527, ¶ 11, 11 P.3d 1199, ¶ 11. This Court reviews the Workers' Compensation Court's findings to determine whether they are supported by substantial credible evidence and reviews its conclusions of law to determine whether they are correct. *See Schimmel v. Montana Uninsured Employers Fund*, 2001 MT 280, ¶ 5, 307 Mont. 344, ¶ 5, 38 P.3d 788, ¶ 5.

¶ 12 Workers' compensation benefits are determined by the statutes in effect as of the date of injury. *Buckman v. Montana Deaconess Hosp.* (1986), 224 Mont. 318, 321, 730 P.2d 380,

4

382. **The 1999 version of the Act applies since it was in effect at the time of Hanks'**

**"krik" incident. Accordingly, all statutory references hereinafter will be to the 1999**

**version of the Act unless otherwise indicated.**

¶ 13    The 30-day notice requirement of the Workers' Compensation Act is located at § 39-71-603, MCA, and  provides as follows:

> A claim to recover benefits under the Workers' Compensation Act for injuries not resulting in death may not be considered compensable unless, within 30 days after the occurrence of the accident that is claimed to have caused the injury, notice of the time and place where the accident occurred and the nature of the injury is given to the employer or the employer's insurer by the injured employee or someone on the employee's behalf.

This provision of the Act is mandatory, and compliance with the notice requirement is indispensable to maintaining a claim for compensation. *Reil v. Billings Processors, Inc*. (1987), 229 Mont. 305, 309-10, 746 P.2d 617, 619.  The purpose of the notice requirement is to enable the employer to protect itself by prompt investigation of the claimed accident and prompt treatment of the injury to minimize its effect. *Larson v. Barry Smith Logging, Inc.* (1994), 267 Mont. 444, 448, 884 P.2d 786, 788-89; *Bender v. Roundup Mining Co.* (1960), 138 Mont. 306, 313, 356 P.2d 469, 473. ¶ 14      Because it is undisputed that Hanks failed to report the "krik" incident to Partners  within 30 days of its occurrence, the threshold question in this case is whether the "krik" incident qualifies as an "injury" under the Workers' Compensation Act.  If it does, Hanks' failure to meet the mandatory requirements of the Act, specifically her failure to timely notify her employer, bars her from receiving workers' compensation benefits.

¶ 15    Injury, under the Workers' Compensation Act, is defined as "an unexpected traumatic incident or unusual strain; identifiable by time and place of occurrence; identifiable by member or part of the body affected; and caused by a specific event on a single day or during a single work shift." Section 39-71-119(2), MCA. In its ruling, the Workers' Compensation Court adopted Liberty's argument that Hanks' back problems arose from a specific event, the "krik" incident, and thus ruled that the "krik" incident did qualify as an injury subject to the Workers' Compensation Act and its 30-day notice provision. In concluding that the "krik" incident qualified as an injury, the court emphasized Hanks' own testimony that prior to the "krik" incident, she had never suffered back problems and that severe pain followed the "krik" incident within a couple of days. This testimony confirms that Hanks' back problems were brought about by the "krik" incident. We conclude that the Workers' Compensation Court's decision was based on substantial credible evidence. Therefore, we affirm its ruling that Hanks suffered an injury to which the notice provision of the Workers' Compensation Act applies.

¶ 16    In some instances, however, the 30 days may be tolled if the employee has a reasonable belief at the time of an accident that he or she has suffered no injury which will require treatment or is otherwise compensable until he or she learns otherwise. *Killebrew v. Larson Cattle Co.* (1992), 254 Mont. 513, 521, 839 P.2d 1260, 1265. In this instance, Hanks' own testimony that severe pain followed the "krik" incident within a couple of days precludes the tolling of the 30 days. This statement confirms that Hanks should have been on notice of the possible relationship between the "krik" incident and her increasing symptoms

6

at that time. Even if this Court were to determine that the 30 days did not start running until a couple of days after the "krik" incident, when Hanks started to experience pain, Hanks did not report the injury to her employer within 30 days of the pain commencing. Hanks failed to notify her employer within 30 days from the date of either the incident itself, or the onset of pain a few days later. Therefore, she is barred from recovering under the Workers' Compensation Act.

¶ 17 Hanks maintains that the Workers' Compensation Act and its 30-day notice requirement do not apply to her because she did not suffer an injury, but rather she suffers from an occupational disease. To that end, Hanks contends that her work-related activity preceding and following the "krik" incident caused her back problems. Therefore, Hanks argues that she is entitled to benefits under the Occupational Disease Act. Instead of a 30-day notice requirement, the Occupational Disease Act requires employer notification within one year of the claimant actually or constructively learning that his or her condition results in an occupational disease. Section 39-72-403, MCA.

¶ 18 Occupational disease is defined as "harm, damage, or death as set forth in § 39-71-119(1) arising out of or contracted in the course and scope of employment and caused by events occurring on more than a single day or work shift." Section 39-72-102(10), MCA (emphasis added). By affirming the Workers' Compensation Court's ruling that Hanks suffered from an injury, this Court necessarily recognizes that her condition was "caused by a specific event on a single day or during a single work shift." Section 39-71-119(2), MCA (emphasis added). Consequently, Hanks is not entitled to bring a claim under the

7

Occupational Disease Act given that her injury did not occur on more than a single day. Moreover, in order for a condition to qualify as an occupational disease under Montana's Occupational Disease Act, it must arise "in the course and scope of employment," § 39-72-102(10), MCA, and be "incidental to the character of the business." Section 39-72-408, MCA. Hanks, however, has not offered any testimony that her underlying preexisting back disease was incidental to her work at Partners and, therefore, has not established that she suffers from an occupational disease. Accordingly, the Workers' Compensation Court was correct in denying her occupational disease claim with prejudice.

¶ 19    Finally, Hanks urges this Court to reverse the ruling of the Workers' Compensation Court because denying her benefits is contrary to public policy. While one "objective of the Montana workers' compensation system [is] to provide, without regard to fault, wage supplement and medical benefits to a worker suffering from a work-related injury or disease," § 39-71-105, MCA, the general intent expressed in that statute is qualified by the particular intent of the 30-day notice requirement of § 39-71-603, MCA. Our precedent clearly states that "[n]otice under the statute is mandatory, and compliance is indispensable to maintaining a claim for compensation." *Larson v. Barry Smith Logging, Inc.* (1994), 267 Mont. 444, 449, 884 P.2d 786, 789; *Reil v. Billings Processors, Inc.* (1987), 229 Mont. 305, 309, 746 P.2d 617, 619.

¶ 20    The Workers' Compensation Court's ruling that the "krik" incident was a single identifiable incident occurring in a single work shift, thus meeting the criteria of an injury, is based on substantial credible evidence. Therefore, the Workers' Compensation Court did not

8

err in concluding that Hanks failed to comply with the 30-day notice requirement of the

Workers' Compensation Act and in dismissing her occupational disease claim with prejudice.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM RICE

Justice Terry N. Trieweiler dissenting.

¶21 I dissent from the majority Opinion. I would reverse the judgment of the Workers' Compensation Court.

¶22 The result in this case is unconscionable and far from compelled by even the blindest adherence to the law.

¶23 The important facts are without dispute. Edna Hanks was a sixty-five year old widow working as a home care aid in 2001 when she developed symptoms of low back disease. She had been employed as a home care aid by Partners in Home Care, Inc., for five and a half years. She continued to work in that occupation, in spite of her age, because the social security benefits to which she is entitled through her deceased husband did little more than make her house payments. Without employment, she would not have been able to feed herself or pay for her transportation.

¶24 By 2001, Edna, like most people her age, had developed considerable underlying degenerative disease in her spine. The evidence was that the degree of underlying degenerative disease would have been aggravated by the nature of employment she had engaged in for the previous five and one-half years, which included heavy lifting, bending and twisting. It was in that condition that she first experienced back symptoms while lifting a patient toward the end of January, 2001. However, she didn't go to the doctor immediately and she didn't complain about her symptoms. That was not her nature. She first saw a physician on February 8, 2001, but was given no diagnosis by that physician which would relate her condition to her job. She continued to work and participated in a

10

regimen of physical therapy. However, when her symptoms persisted, her treating physician limited her to light duty and referred her to a neurosurgeon. That occurred on March 27, 2001. The next day, claimant immediately advised her supervisor about her condition and the fact that it first became symptomatic during the course of her employment sometime in January.

¶25 Up until March 27, 2001, Hanks had continued to perform all of her duties, including lifting people up and out of bed and in and out of wheelchairs. She testified that when she originally experienced the back pain, she had assumed it was due to an arthritic condition since her mother had suffered from disabling arthritis.

¶26 No one questions that Edna Hanks' condition from which she is now disabled is related to her employment. No one questions the severity of her condition nor the extent of her permanent disability. Finally, no one disputes that Hanks notified her employer that her disability is work related immediately after learning that she would need medical treatment and be unable to return to her normal employment duties. In spite of these undisputed facts, and with the blessing of this Court, Edna Hanks has been denied any compensation for her substantial medical expenses or her lifetime of disability based on catch 22 provisions in the Workers' Compensation Act.

¶27 The Workers' Compensation Court and this Court have concluded that Hanks' condition could not be an occupational disease because it first became symptomatic during a single lifting incident. Yet,

because she sustained an "injury" during that incident, she is not eligible for benefits because she did not notify her employer about the "injury" that she did not know she had sustained for a period of more than thirty days.

¶28 Based on the not uncommon facts in this case, I would interpret the evidence in a manner that permits recovery of benefits.

¶29 First, I disagree with the majority's conclusion in ¶ 16 that "Hanks' own testimony that severe pain followed the "krik" incident within a couple of days precludes the tolling of the thirty days." Hanks actually testified as follows:

> So I felt a little cringe or a little crook in my back, as I called it. And it hurt a little bit, but I thought I was just-you know, just some little thing was going on. I didn't expect anything more than that. And it stopped, and I didn't have anymore pain. And I didn't tell her hubby that I felt a little cringe in my back and that. I just kind of let it go after that.
>
> Two or three days later, I-when I started to get in and out of the car, it was hard for me to get in and out of the car. And then, it quit again. And it was pain, little pains going down my right leg, not my left leg, my right leg. And I didn't think anymore about it until, oh, it was January, February, March-towards March, I started really hurting bad at nights and that. . . .
>
> So, I went back to Dr. Selbach and she sent me to Dr. Beck. . . .
>
> So again they-I can't remember the date of the MRI but, anyway, I had the MRI and then I went back to Dr. Beck's. And it had to be about the 27th of March because just as soon as he told me what was wrong and he could see that it was wrecked, you know, on the MRI-it's like an x-ray. I went right over to Partners and told them what was going on and that I couldn't work.

¶30 There were only two witnesses in this case. Edna Hanks gave the foregoing testimony at the hearing before the Workers'

12

Compensation Court.  Dr. Randale Sechrest testified by deposition.
Hanks' testimony as set forth above was uncontroverted.
Therefore, I disagree with the majority's conclusion that based on
her own testimony, severe pain followed the "krik" incident within
a couple of days which precludes the tolling of the thirty-day
report period.  I would apply *Killebrew v. Larson Cattle Co.*
(1992), 254 Mont. 513, 830 P.2d 1260, to toll the thirty-day period
even if it had been established that Hanks had sustained an
occupational "injury" rather than an "occupational disease."

¶31  However, I also disagree with the majority's observation in ¶
18 that Hanks has not offered testimony that her underlying pre-
existing back disease was incidental to her work at Partners and,
therefore, has not established an occupational disease.

¶32  It is true that Dr. Sechrest testified that the lifting
incident in January contributed to her disability.  However,
Sechrest also testified that there is a relationship between the
frequency of low-back problems and healthcare work because of the
lifting, bending and twisting that is done over a period of time.
She testified that injury to the lumbar spine occurs primarily from
axial loading, flexion and twisting-all factors that are present
for the healthcare worker.  She testified that in addition,
healthcare workers are typically lifting patients in abnormal
positions where they cannot apply good body mechanics.  She stated
that the longer a person is a healthcare worker, the more
cumulative stress and strain is applied to the back.

¶33 Dr. Sechrest testified that she believed there was a direct causal connection between healthcare work and Edna's ultimate physical condition. Most importantly, she gave the following testimony:

> Q. Well, some people suffer from spinal stenosis. [A condition diagnosed in Hanks.] And I'm wondering if there's a positive correlation between lifting, heavy lifting, awkward lifting and acceleration or development of spinal stenosis?
>
> A. I would say intuitively there is. Intuitively, and probably in a broad sense bending, twisting, lifting would increase and accelerate the degree of, one, your risk of disc injury, risk of disc degeneration and would accelerate the condition once it occurs.
>
> Q. So, the lifting and working with patients that Edna did in the year preceding the crick were contributing factors to whatever degenerative disc disease she had, correct?
>
> A. Yes.
>
> . . . .
>
> Q. Are you saying that it's not possible for you to give an opinion to discriminate between how much was pre-existing condition caused by just general heavy work and how much was caused by lifting the Alzheimer's patient?
>
> A. I think that would be accurate, as I understand your question.

¶34 Based on the quoted testimony from Dr. Sechrest, I would conclude that the Workers' Compensation Court was clearly erroneous when it found that "lacking in his [Dr. Sechrest's] testimony and report is any indication that her underlying, pre-existing back disease was in whole or in part an occupational disease." I would conclude that the Workers' Compensation Court was also clearly erroneous when it found that Dr. Sechrest's testimony established that Hanks' condition was made symptomatic by a single incident.

14

Dr. Sechrest actually testified that she was unable to distinguish between a single incident and the nature of Hanks' employment for purposes of determining what made Hanks' back condition symptomatic.

¶35 Traditionally we defer to trial judges and juries in the resolution of factual disputes. However, as we have frequently noted, that deference makes no logical sense where the Workers' Compensation Court simply reads the same deposition that we read. In that situation, we are in as good a position to evaluate the medical testimony as the trial judge. See *Brown v. Ament* (1988), 231 Mont. 158, 752 P.2d 171, and *Shupert v. Anaconda Aluminum Co.* (1985), 215 Mont. 182, 188, 696 P.2d 436, 439.

¶36 Although Dr. Sechrest was unable to distinguish between the single incident in January and the long-term nature of Hanks' work for purposes of determining which more significantly contributed to her symptoms, I would conclude that when, as in this case, it is undisputed that her condition is work related, the uncertainty must be resolved in favor of providing workers' compensation coverage to the injured employee. Otherwise, the public policy set forth at § 39-71-105, MCA, to provide wage supplement and medical benefits to a worker suffering from a work-related injury or disease is frustrated.

¶37 This case is just the most recent example of a trend, which began in this state in 1987, to write and interpret laws for the benefit of employers and insurers without regard to the terrible human consequences that work-related injuries and diseases have on

15

working people.  I sometimes wonder if, collectively, the citizens of this state have lost sight of the fact that injured workers are real human beings with families, frequently substantial medical expenses and bills to pay for food, housing and transportation.  I am sometimes concerned that as a society we have become so self centered that no one cares.

¶38  Our case law is replete with examples of the insurance industry's efforts to prove that a disabled worker had an "occupational disease" rather than an "injury" when it was to the insurer's advantage to do so.  Here, on the other hand, where the injury claim is arguably barred by an unreasonable and unfair procedural requirement, the insurer goes to great lengths to spin Hanks' affliction as an "injury" rather than a disease.  If anyone ever needed an example of the cold and calculated manner in which injured workers are treated and the reason why liberal sanctions and attorney fees should be awarded to claimants who have been unlawfully denied their benefits, this case is it.

¶39  The state of the workers' compensation laws in Montana have become so unfair and one-sided that I have concluded employees would be better off if the whole system was scrapped and they were given back their common rights to sue employers who cause them injury by employer negligence.  Why should employers be protected from liability for unsafe workplaces when employees get nothing in return?  The assumed quid pro quo is simply no longer there.

¶40  For these reasons, I dissent from the majority Opinion.  I would reverse the judgment of the Workers' Compensation Court.

16

/S/ TERRY N. TRIEWEILER